1
2
3
4
5
6

O
JS-6

# United States District Court
# Central District of California

MELISSA KAY COOK, individually and as Guardian Ad Litem of BABY A, BABY B, and BABY C,

Plaintiff,

v.

CYNTHIA ANNE HARDING; JEFFREY D. GUNZENHAUSER; DEAN C. LOGAN; EDMUND G. JERRY BROWN, JR.; KAREN SMITH; KAISER FOUNDATION HOSPITAL; PANORAMA CITY MEDICAL CENTER; PAYMAN ROSHAN; and C.M.,

Defendants.

Case № 2:16-cv-00742-ODW (AFM)

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS [44, 46, 54, 60]**

## I.   INTRODUCTION

Plaintiff Melissa Kay Cook ("Cook"), individually and as Guardian Ad Litem for Babies A, B, and C, brings suit against Governor Jerry Brown, Karen Smith (Director and State Public Health Officer for the California Department of Public

Health), Cynthia Harding (Director of Los Angeles County Public Health Department), Jeffrey Gunzenhauser (Medical Director for Los Angeles County Public Health), and Dean Logan (Registrar-Recorder for Los Angeles County) in their official capacities, as well as Kaiser Foundation Hospital, Panorama City Medical Center, Payman Roshan (Senior Vice President and Patient Administrator for Panorama City Medical Center), and C.M. (the genetic father and intended parent of Babies A, B, and C).

Cook brings as-applied and facial constitutional challenges under 28 U.S.C. § 1983, alleging that California Family Code section 7962, the enabling statute affording protection to surrogacy contracts in the state, violates the Substantive Due Process, Procedural Due Process, and Equal Protection rights of surrogate mothers and the children they carry to term.  She seeks declaratory and injunctive relief. (Second Amended Complaint ("SAC"), ECF No. 25.)

Now before the Court are four Motions to Dismiss.  (ECF Nos. 44, 46, 54, 60.) Each asks this Court to refrain from retaining jurisdiction over Cook's case based on myriad abstention and jurisdictional doctrines.  Because the Motions raise similar arguments, the Court will address all four in this Order.  For the reasons discussed below, the Court finds it necessary to abstain, and accordingly **GRANTS** dismissal of the matter in its entirety with prejudice under Rule 12(b)(1).

## II.    FACTUAL BACKGROUND

### A. Surrogacy Contracts in California

At the heart of Cook's claims lies the Family Code provision that allows for the enforceability of surrogacy contracts in California.  (SAC ¶ 1.)  However, in order to understand the current scientific and legal landscape in which Cook and the Defendants find themselves, a history lesson is appropriate.

In 1975, California adopted the Uniform Parentage Act in an effort to eliminate the legal distinction between legitimate and illegitimate children.  *See Johnson v.*

*Calvert*, 5 Cal. 4th 84, 88–89 (1993).  In the wake of several Supreme Court decisions mandating the equal treatment of children regardless of the marital status of their parents, the Act instead based parent and child rights on the existence of a parent-child relationship, rather than on the marital status of the parents.  *See id.* (citing *Levy v. Louisiana*, 391 U.S. 68 (1968)) (state could not deny illegitimate children the right to bring a tort action for wrongful death of the parent if it gave a legitimate child the same right); *Glona v. Am. Guarantee Co.*, 391 U.S. 73 (1968) (state could not deny the parent of an illegitimate child the right to bring a tort action for wrongful death of a child if it gave the parent of a legitimate child the same right).

The Act became part 7 of division 4 of the California Civil Code, sections 7000–7021, defining the "parent and child relationship" as "the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations," and applying the definition "equally to every child and to every parent, regardless of the marital status of the parents."  Cal. Civ. Code §§ 7001–7002.  Under state law, the "parent and child relationship" would thus encompass two kinds of parents, both "natural" and "adoptive."  *Id.*; *see also Calvert*, 5 Cal. 4th at 89.

The Act, of course, did not imagine the myriad ways in which technology and human ingenuity would expand our notions of family and parentage.  Louise Brown, the first human to be born via in vitro fertilization, or IVF,[1] was born three years after California adopted the Act; the first American born via IVF was born in 1981.[2] Today, nearly two percent of all children born are conceived through IVF or other

---

[1] IVF refers to the complex series of procedures used to treat infertility.  First, mature human ova, or eggs, are collected from a woman's ovaries and fertilized by male sperm in a laboratory setting.  The now-fertilized embryo is then implanted into the female uterus, where it ideally will mature into a healthy baby.  Mayo Clinic Staff, *In vitro fertilization (IVF)*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/in-vitro-fertilization/basics/definition/prc-20018905 (last visited June 3, 2016).

[2] Walter Sullivan, *First 'Test-Tube' Baby Born in U.S., Joining Successes Around the World*, N.Y. Times (Dec. 24, 1981), http://www.nytimes.com/learning/general/onthisday/big/1228.html#article.

forms of assisted reproductive technologies.[3]   Adding an additional layer to the twenty-first century notion of the family, several children are born not from their mother, but from a third party surrogate.  Surrogacy, however, is nothing new; would-be parents yearning for a child of their own have enlisted the help of others since biblical times.[4]  Coupling the help of a third party surrogate and IVF technology, a woman may bear a child with whom she has no genetic relationship.[5]   Today, thousands of children are born through surrogacy arrangements.[6]  In *Calvert*, the California Supreme Court held that such arrangements are permissible and that, in

---

[3] Karen Caplan, *More than 1.5% of American babies owe their births to IVF, report says*, L.A. Times (Mar. 3, 2015), http://www.latimes.com/science/sciencenow/la-sci-sn-ivf-live-births-success-rate-20150303-story.html.

[4] *See* Genesis 16:2 ("And Sarai said unto Abram, Behold now, the LORD hath restrained me from bearing: I pray thee, go in unto my maid; it may be that I may obtain children by her. And Abram hearkened to the voice of Sarai."); Genesis 30:3 ("And [Rachel] said, Behold my maid Bilhah, go in unto her; and she shall bear upon my knees, that I may also have children by her.").

[5] This does not mean all surrogates are, or must be, strangers.  For example, gay couples wishing to pass along the genetic traits of both fathers may seek the help of a sister or cousin, or sisters may serve as surrogates for their heterosexual brothers.  Such arrangements are neither uncommon nor unrepresented in pop culture.  *See* Adam P. Plant, *With A Little Help from My Friends: The Intersection of the Gestational Carrier Surrogacy Agreement, Legislative Inaction, and Medical Advancement*, 54 Ala. L. Rev. 639, 642 (2003)

> ("The following dialogue from the episode [of popular sit-com Friends] where Phoebe was asked to act as Frank and Alice's carrier shows well the human element incumbent in cases of gestational carrier surrogacy. Upon learning that Frank and Alice had eloped, Phoebe remarked:
> Phoebe: . . . So, I gotta get you a gift now. Is there anything you need?
> Frank: Uhh, yeah.
> Alice: We've been trying to get pregnant, uh pretty much ever since we got engaged, we thought we'd get a jump on things, y'know no one's getting any younger.
> Frank: See the thing is umm, we're not able to y'know, uh, conceive.
> Alice: And we've tried everything, we've seen a bunch of doctors.
> Frank: Yeah, and they—and they say that our—that our only chance to have a baby is that if they take my sperm, her egg and put it together in a dish and then put it into another girl. So we were wondering if you could be the girl that we could put it into.
> Phoebe: (shocked) That's a really nice gift. I was thinking of like a gravy boat.")

[6] The Centers for Disease Control estimates that 19,218 births have resulted from surrogacy arrangements as of 2010 in California alone, with a nationwide estimate of 137,482.  Magdalina Gugucheva, *Surrogacy in America*, Council for Responsible Genetics (2010), http://www.councilforresponsiblegenetics.org/pageDocuments/KAEVEJ0A1M.pdf, at 10.

light of the Uniform Parentage Act's definition of parentage, the intended mother—and not the surrogate—should be deemed a child's mother.  5 Cal 4th at 90–97.

Surrogacy arrangements began and continued in California without any statutory authorization until, in 2012, the California legislature passed the statute at issue here.  2012 Cal. Legis. Serv. (West).  Under section 7962 of the California Family Code, where a gestational surrogate or carrier[7] and the intended parent(s) enter into a contract that meets certain specifications, and where that contract is presented before a court, the intended parents will be listed on the issued birth certificate and all parental rights of the surrogate will be severed.  *See* Cal. Fam. Code § 7962.  (*See also* SAC ¶ 23.)

Presenting a valid surrogacy agreement to the court rebuts any presumptions that the surrogate and her spouse are the legal parents of the child or children.  § 7962.  For a surrogacy contract to be valid under the statute, the contract must have the following information:

1. The date the contract was executed;

2. The names of the persons from which the gametes [ova and sperm] originated, unless anonymously donated;

3. The name(s) of the intended parent(s); and

4. A disclosure of how the medical expenses of the surrogate and the pregnancy will be handled, including a review of applicable health insurance coverage and what liabilities, if any, that may fall on the surrogate.

Furthermore, this agreement must be entered into before any embryo transfer begins; both the intended parent(s) and the surrogate must be represented by separate,

---

[7] California law distinguishes between so-called "traditional surrogates" and "gestational carriers." A gestational carrier is one "who is not an intended parent and who agrees to gestate an embryo that is genetically unrelated to her," whereas a traditional surrogate is "a woman who agrees to gestate an embryo, in which the woman is the gamete donor and the embryo was created using the sperm of the intended father or a donor arranged by the intended parent or parents."  Cal. Fam. Code § 7960(f)(1)–(2).  Section 7962's failure to mention traditional surrogacy in its framework indicates that only gestational carrier arrangements, wherein the surrogate has no genetic tie to the fetus(es), will be afforded legal protection.

independent counsel before executing the agreement; and the agreement must be signed and notarized. *Id.*

The statute also establishes that, upon proof of a valid surrogacy agreement, the court will terminate the parental rights of the surrogate and her spouse "without further hearing or evidence, unless the court or a party to the assisted reproduction agreement for gestational carriers has a good faith, reasonable belief" that the agreement or accompanying attorney declarations were not executed in accordance with § 7962. *Id.* Surrogacy contracts will be deemed "presumptively valid" and cannot be rescinded or revoked without a court order. *Id.*

The statute places no conditions on who can serve as a surrogate (beyond requiring that she not be genetically related to the fetuses) or who may solicit the services of a gestational carrier. (SAC ¶ 39.) No minimum levels of income, intelligence, age, or ability are required for either the surrogate or the intended parent(s). (*See id.* ¶¶ 30, 38.) The statute does not require that the intended parents shoulder all costs associated with surrogacy, and only states that the financial accommodations necessary for the arrangement are to be detailed in the surrogacy contract.

## B. Cook's Contract and Pregnancy

Cook is a California resident. (*Id.* ¶ 12.) Cook enlisted the help of Surrogacy International, Inc., a California-based surrogacy broker, to offer her services for a hopeful family. (*Id.* ¶ 44.) The broker matched her with C.M., though at no point to date has Cook ever met C.M. or even spoken with him via telephone. (*Id.* ¶ 45.) Cook does not believe that Surrogacy International or the physician who performed the embryo transfer, Dr. Jeffrey Steinberg, conducted a home study of C.M.'s living arrangements to determine his parenting capabilities. (*Id.* ¶¶ 49, 52.) At the time of the embryo transfer, Cook was 47 years old. (*Id.* ¶ 12.) She gave birth to C.M.'s triplet boys (Babies A, B, and C) on February 22, 2016. (*Id.* ¶ 2.)

The intended parent and genetic father, C.M., resides in Georgia.  C.M. is a fifty year old postal worker who is single, deaf, and lives with his two elderly parents.  He is the biological and legal father of Babies A, B, and C.  (*See* Section 7962 Order, State Defs.' Req. for Judicial Notice ("RJN"), Ex. B, ECF No. 55.)

The two parties entered into a contract on May 31, 2015 for Cook to serve as a gestational surrogate, with an anonymous ova donor and C.M. providing the necessary genetic material.  (SAC ¶¶ 19, 50.)  Surrogacy International drafted a 75-page surrogacy agreement and the broker's owner and attorney, Robert Walmsley, served as C.M.'s counsel.  (*Id.* ¶ 50.)  As per the surrogacy agreement, C.M. paid Lesa Slaughter of The Fertility Law Firm to represent Cook.

Cook began the agreed-upon intensive hormone treatment on June 13, 2015, in advance of the embryo transfer.  (*Id.* ¶ 54.)  Knowing of Cook's advanced age and C.M.'s request that multiple embryos be transferred, on August 17, 2015 Dr. Steinberg implanted three six-day-old fertilized male embryos into Cook's uterus.  (*Id.* ¶¶ 64, 69.)  On August 31, 2015, her viable pregnancy with triplets was confirmed.  (*Id.* ¶ 65.)  Up until this point, it appears that neither party to the surrogacy agreement had any reservations.

Cook and C.M.'s fractured and tenuous relationship began a few weeks later.  On September 16, 2015, C.M. emailed Cook and mentioned the possibility of her reducing the pregnancy, and asked her how much longer she would have to obtain a legal abortion.  (*Id.* ¶ 67.)  The next day, C.M. emailed the fertility clinic monitoring Cook's pregnancy, requesting that Cook's medical visits be "less often, because [he] gets a bill that costs [him] a lot of money."  (*Id.* ¶ 68.)  He also expressed his concern that he may not be able to afford triplets, or perhaps even twins.  (*Id.*)  The clinic insisted that Cook's high-risk pregnancy required weekly visits.  (*Id.* ¶ 69.)  On September 18, 2015, C.M. emailed Walmsley at Surrogacy International to reiterate his financial concerns about the cost of the medical visits.  (*Id.* ¶ 70.)  While he said that he did not want to reduce two of the pregnancies, his financial situation left him

considering terminating all three pregnancies.  (*Id.*)  According to Cook, at this time it became apparent that C.M. had depleted his life savings paying for the infertility doctors, surrogacy broker, the anonymous ova donor, the attorneys, and Cook's surrogate trust account.  (*Id.* ¶ 71.)

Over the course of the next week, Cook and C.M. exchanged several emails, wherein C.M. reiterated that he was concerned about his financial strain.  (*Id.* ¶¶ 73–76.)  While Cook offered to care for the three boys for a few months after their birth so C.M. could financially prepare, on September 22, 2015, C.M. requested that Cook reduce the pregnancy by one fetus, citing their surrogacy agreement's "Selective Reduction" clause.  (*Id.* ¶¶ 75, 77.)  Cook refused, citing her anti-abortion beliefs.  (*Id.* ¶ 78.)

C.M. and the surrogacy broker then attempted to convince Cook to abort one of the fetuses.  (*Id.* ¶ 79.)  C.M. reiterated that he was worried about his financial situation, and also stressed that the high-risk pregnancy could jeopardize the health of all three fetuses if the pregnancy is not reduced.  (*Id.*)  Cook, in turn, stressed that the fetuses were all healthy, and was adamant that she would not have an abortion.  (*Id.*)

On October 28, 2015, C.M. advised Cook via email that he may consider looking for adoptive parents for one or more of the children.  (*Id.* ¶ 80.)  On November 12, 2015, Cook responded and said that if he was considering adoption, she would happily raise one of the babies herself.  (*Id.* ¶ 81.)  Again, C.M. firmly requested that Cook terminate one of the pregnancies.  (*Id.* ¶ 82.)  He reiterated his request multiple times between November 16, 2015 and November 27, 2015.  (*Id.* ¶¶ 83–84.)

After C.M.'s September 22 reduction request, Cook contacted Lesa Slaughter, the attorney she used when signing the surrogacy contract.  (*Id.* ¶ 85.)  By the end of November 2015, Cook and C.M. were communicating through counsel.  (*Id.* ¶ 88.)  C.M.'s attorney informed Cook in writing that, by refusing to reduce, she was in breach of the contract and liable for money damages thereunder.  (*Id.*)  On November

30, 2015, Cook again emailed C.M. and said she would not terminate any of the pregnancies, and instead "decided" that she would raise one of the boys herself. (*Id.* ¶ 90.)  C.M. refused to accept that decree and, as the biological parent of the three boys, said he intended to put one of them up for adoption if she did not terminate. (*Id.* ¶ 91.)  Despite their obvious difference of opinion and Cook's firm belief that C.M. could not adequately care for even one of the Babies, Cook continued the pregnancy and C.M. continued to pay her medical expenses.

As explained below, C.M. filed the requisite paperwork under section 7962 with the California Children's Court in January 2016 and, on February 9, 2016, the court granted C.M.'s petition to terminate Cook's legal relationship with the Babies and to name C.M. as the sole parent.  (*Id.* ¶¶ 179, 184; Section 7962 Order.)  The court's order would then be given to Kaiser Permanente's Panorama City Medical Center for its enforcement.  (SAC ¶ 186.)  On February 9, 2016, the date of the Children's Court's § 7962 order, Cook informed C.M. that she would no longer accept payments from him, claiming it felt "wrong" to accept payment for carrying the Babies.  (*Id.* ¶ 93.)  As of that date, C.M. still owed Cook $19,000 under the surrogacy contract.  (*Id.*)

The Babies were born prematurely (at 28 weeks gestation) on February 22, 2016, and they remained in the Neonatal Intensive Care Unit at Panorama City Medical Center for seven weeks.  (*Id.* ¶¶ 2, 187.)  Cook repeatedly tried to see the Babies and obtain their private medical information; for the security of the Babies and to ensure C.M.'s privacy, Panorama City Medical Center installed additional security on Cook's hospital floor.  (*Id.* ¶¶ 8, 20, 190–94.)

### III.   PROCEDURAL BACKGROUND

Cook first filed a Complaint in the Los Angeles Superior Court (Van Nuys) on January 4, 2016, alleging state law violations as well as violations of her and the Babies' Equal Protection and Due Process rights.  (SAC ¶ 5; *C.M. v. M.C.*, No. BF

054159 ("Sup. Ct. Compl."), State Defs.' RJN, Ex. A, ECF No. 55.)  She also sought to enjoin C.M. from filing a section 7962 petition before the court ruled on her constitutional claims.  (Sup. Ct. Compl.)  On January 6, 2016, C.M. filed a petition under section 7962 in the California Children's Court to terminate the parental rights of Cook and name C.M. as the sole parent of the yet-to-be-born Babies.  (Section 7962 Order.)  The Superior Court then dismissed Cook's action *sua sponte* without prejudice, finding that (1) her application for a civil harassment order against C.M. was filed in the wrong court (it should have been filed in the Children's Court or Family Court, not Superior Court), and (2) she did not properly serve her *ex parte* injunctive relief application, and in any event the application was mooted by C.M.'s January 7, 2016 section 7962 petition.  (*C.M. v. M.C.*, No. BF 054159 Minute Order ("Sup. Ct. Order"), State Defs.' RJN, Ex. A, ECF No. 55.)

Cook then filed an Answer and Counterclaim to C.M.'s petition on February 1, 2016, as well as an *ex parte* application to continue the petition hearing on February 4, 2016; that *ex parte* application was denied.  (Section 7962 Petition Answer, Plf.'s RJN, Ex. 10, ECF No. 84; *Ex Parte* Hearing, Plf.'s RJN, Ex. 8, ECF No. 84.)  On February 9, 2016, Judge Amy Pellman of the Children's Court granted C.M.'s petition and severed Cook's parental rights.  (Section 7962 Order.)  Based on her reading of section 7962, Judge Pellman barred Cook from raising facts that arose during the pregnancy to demonstrate that C.M. would not and should not accept legal responsibility for the Babies, and held that the statute did not allow the court to consider the best interests of the children or for Cook to offer her opinions concerning C.M.'s parenting abilities.  (SAC ¶¶ 181–85.)  Cook, in turn, argues that Judge Pellman failed to consider her timely filed Answer and Counterclaim, and that she was given no opportunity to contest the petition.  (*Id.*)

On February 2, 2016, after the Superior Court's *sua sponte* dismissal of her Complaint but before C.M.'s section 7962 petition was granted, Cook filed suit in this Court.  (Compl., ECF No. 1.)  She has since amended her Complaint twice, and the

SAC claims that the statute:

1. Violates the Babies' substantive Due Process rights by denying them a relationship with their "mother." She further alleges that the Babies have a Fourteenth Amendment right "to be free from being treated as a commodity or as chattel";

2. Fails to allow for a consideration of the best interests of the Babies, where the placement of minor children in other custody-related disputes would allow consideration their interests, and thus violates the Babies' Equal Protection rights. She also claims that § 7692 unconstitutionally deems children born to surrogates a "class of motherless children" in violation of the Fourteenth Amendment;

3. Violates her substantive and procedural Due Process rights, as she has a fundamental interest in continuing her relationship with the children she bares, and that no contract that terminates her parental rights before birth is constitutionally enforceable;

4. Violates her substantive Due Process right to be free from state-authorized exploitation of her and her reproductive capacity, and that she has a fundamental interest in the best interests of the children she carries;

5. Fails to provide her with the same treatment as other "mothers" subject to a parental rights termination proceeding, as required by the Equal Protection Clause;

6. Violates the procedural Due Process rights of both herself and the Babies by denying them a fact-finding hearing before the termination of their relationship;

7. Violates the substantive Due Process rights of both herself and the Babies by allowing a state-authorized surrogacy contract to expose them to significant health risks; and

8. Violates state and federal laws against servitude and peonage.

(ECF No. 25.)

Cook seeks injunctive and declaratory relief, and asks the Court to enjoin enforcement of section 7962. (*Id.*) She requests an interim injunction that:

1. Bars the State Defendants from enforcing the § 7962 judgment against her;

2. Bars the Hospital Defendants from limiting her access to the Babies;

3. Compels C.M. to provide equal parenting time, restrains him from taking the children out of state, and:

   a. Permanently enjoins him from surrendering custody of any of the children;

   b. Directs him to give Cook permanent custody of one of the Babies; and

   c. Requires C.M. to submit to the jurisdiction of the state court system for a final custody determination of the other two Babies.

(*Id.*)

On February 23, 2016, Cook appealed Judge Pullman's February 9 judgment. (Notice of Appeal, Plf.'s RJN, Ex. 14, ECF No. 84.) On March 30, 2016, she filed a Petition for Writ of Supersedeas, as well as several *ex parte* applications to see the children at the hospital. (Writ, Plf.'s RJN, Exs. 15, 17, ECF No. 84.) The applications were denied. (Writ Denial, Plf.'s RJN, Ex. 18, ECF No. 84.) The Court of Appeal initially stayed the case and prohibited all parties from removing the Babies from California. (App. Ct. Stay, Plf.'s RJN, Ex. 16, ECF No. 84.) However, on April 14, 2016, the appellate court denied the Writ Petition and lifted the stay. (App. Ct. Denial, Plf.'s RJN, Ex. 19, ECF No. 84.) That same day, the Babies were released to the care of their father, C.M.; they are no longer in the care of Panorama City Medical Center. (Hosp. Defs.' Mot. 3, ECF No. 60.)

Pending before the Court now are four Motions to Dismiss. Governor Brown and Karen Smith ("the State Defendants"); Cynthia Harding, Jeffrey Guzenhauser, and Dean Logan ("the County Defendants"); Kaiser Foundation Hospital, Panorama City Medical Center, and Payman Roshan ("the Hospital Defendants"); and C.M. each move for dismissal under Federal Rules of Civil Procedure 12(b)(1) and (6). (ECF

Nos. 44, 46, 54, 60.)  Cook filed a timely joint opposition to the State, County, and Hospital Defendants' Motion and a timely, separate opposition to C.M.'s Motion. (ECF Nos. 74–75.)  Each Defendant tendered a timely Reply.  (ECF Nos. 86–89.) Their Motions are now before the Court for decision.

## IV.   LEGAL STANDARD

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the court must dismiss a complaint when it lacks subject matter jurisdiction.  Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the court's jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).  Where, as here, a defendant makes a facial attack on subject matter jurisdiction, the court must accept the plaintiff's allegations as true and draw all reasonable inferences in the plaintiff's favor when determining whether the facts alleged are sufficient to establish federal jurisdiction.  *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).  Should the plaintiff fail to satisfy every element necessary for subject matter jurisdiction, the Rule 12(b)(1) motion should be granted.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

Generally, a court should freely give leave to amend a complaint after granting a dismissal.  Fed. R. Civ. P. 15(a).  However, a court may deny leave to amend when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *see also Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## V.   DISCUSSION

Cook's claims touch on some of the most personal and binding relationships that a

person will have in his or her lifetime: the bond between a parent and a child.  At the heart of her suit, she asks this Court to assess the constitutionality of how a state defines parenthood and to hold that no state can afford respect and force of law to a private contract between consenting adults for the gestation of a human being, no matter the biological relationship (or lack thereof) of the surrogate mother and the fetus she carries to term.[8]  She seeks both parental rights for herself and, perhaps, the end of recognized, binding surrogacy contracts in the State of California.[9]

## A. Justiciability

While acknowledging the gravity of her claims, Defendants assert that such claims are nonjusticiable in this Court.  Each have filed Motions to Dismiss, and each raise arguments unique to the individual Defendant while also arguing that various abstention doctrines should be applied to the case at bar.  (ECF Nos. 44, 46, 54, 60.)  Defendants contend that Cook's claims implicate duties involving state judicial processes that cannot be properly determined by a federal court, and that Cook seeks remedies that cannot be molded without violating established principles of comity and federalism.  (*See* State Defs.' Mot. 15–16, ECF No. 54.)

"The judicial power of the United States defined by Art[icle] III is not an

---

[8] Cook's arguments are a matter of first impression, even if surrogacy contracts are no stranger to California courts.  Cook insists that the preeminent case on this subject, *Johnson v. Calvert*, 5 Cal. 4th 84 (1993), establishes that surrogates have maternal rights—just, perhaps, not as strong as those belonging to the intended mother.  (Plf.'s Opp'n to C.M. Mot. 4, ECF No. 75.)  Setting aside whether Cook correctly interprets *Calvert*, the legal dance at bar requires the Court to accept a premise which no court in California has yet to do: that where there is no intended mother present in a child's life, a surrogate with no biological relationship with the fetus then carries the maternal mantle and has parental rights of her own.

[9] Should Cook ultimately prevail, the Court is at a loss to imagine an intended parent in this state who would contract with a gestational surrogate, knowing that the woman could, at her whim, "decide" that the intended parent or parents are not up to snuff and challenge their parenting abilities in court.  Surely Cook's normative world would be one far different today's; after all, "[w]hat a far different experience life would be if the State undertook to issue children to people in the same fashion that it now issues driver's licenses. What questions, one wonders, would appear on the written test?"  *J.R. v. Utah*, 261 F. Supp. 2d 1268, 1298 n.29 (D. Utah 2002).

unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian Coll. v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982).   Rather, Article III limits "the federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.'" *Id.* at 472 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).   Cases are thus nonjusticiable when the subject matter of the litigation is inappropriate for federal judicial consideration.   *Baker v. Carr*, 369 U.S. 186, 198 (1962).   In determining whether a case is justiciable, "consideration of the cause is not wholly and immediately foreclosed; rather, the [c]ourt's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.*   "It is the role of the courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).   These basic concerns are heightened when a lawsuit challenges core activities of state responsibility.   *Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976).

Special considerations are at play when related litigation appears in both state and federal court.   "Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts." *Younger v. Harris*, 401 U.S. 37, 43 (1971).   This desire is premised upon the fundamental and vital role of comity in the formation of this country's government and "perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism.'" *Id.* at 44.   Our Federalism demonstrates "a proper respect for state functions, a recognition of the fact that the

entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways." *Id.*  It represents "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.*

It is within the context of this foundational concept of comity, which strikes at the heart of the country's governing principles, that the court must view this case.  The Court is cognizant of the gravity of Cook's claims, should they have merit.  But the Court is equally cognizant of the profound and consequential principles of federalism implicated by this case.   Accordingly, it is with careful attention to these two significant but conflicting interests that the court undertakes its analysis of justiciability under *Younger v. Harris* and its progeny.[10]

### B. *Younger* Abstention

In *Younger v. Harris*, the Supreme Court declined to enjoin a pending state criminal prosecution under the state's criminal syndicalism law, which the plaintiff argued violated the First Amendment.  401 U.S. at 40–41.  The Court "observed that Congress over the years has manifested an intent to permit state courts to try state

---

[10] Defendants also contend that Cook lacks standing to bring her claims, both as to specific Defendants and more generally.   (State Defs.' Mot. 8–11; C.M. Mot. 12–15, ECF No. 46.) Defendants' arguments concerning abstention and standing relate to whether Cook's claims are properly before the Court and within the confines of the judicial authority conferred by Article III. Indeed, assuming that Cook has sufficiently alleged injury in fact and causation, something Defendants vehemently refute, the Court's conclusions relating to its ability to redress such injury, as set forth *infra*, "obviously shade into those determining whether the complaint" sufficiently presents a real case or controversy for purposes of standing.  *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974). Accordingly, the Court declines to address Defendants' injury and causation arguments, as *Younger* dictates that the federal court should not be the body to provide redress.

cases free of federal interference. It identified two sources for this policy: the constraints of equity jurisdiction and the concern for comity in our federal system." *Gilbertson v. Albright*, 381 F.3d 965, 970 (9th Cir. 2004).  Principles of equity prevent erosion of the role of juries within our judicial system and the duplication of legal proceedings where one suit can adequately safeguard the rights asserted.  Comity, on the other hand, pays respect to legitimate state functions.  Of these two principles, comity proves to be the more "vital consideration."  *Id.* at 971 (quoting *Younger*, 401 U.S. at 43–45); *see also New Orleans Pub. Serv., Inc. v. Council of New Orleans* (*NOPSI*), 491 U.S. 350, 364 (1989) (stating that *Younger* rested "primarily on the 'even more vital consideration' of comity"); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 10 (1987) (noting comity as *Younger*'s second and "even more vital" explanation for its decision); *Juidice v. Vail*, 430 U.S. 327, 334 (1977) (emphasizing that comity is the "more vital consideration").

These values still bolster the so-called *Younger* doctrine, which has expanded beyond its original roots.  Now, generally speaking, federal courts should abstain from granting declaratory or injunctive relief where doing so would interfere with a pending state judicial proceeding, criminal or civil, that touches on matters of state concern. *Hirsh v. Justices of the Supreme Ct. of Cal.*, 67 F.3d 708, 712 (9th Cir. 1995) (citing *Younger*, 401 U.S. at 40–41); *see also Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975) (holding that the *Younger* principles likewise counsel abstention from state civil proceedings); *Samuels v. Mackell*, 401 U.S. 66, 72 (1971) (extending *Younger* to declaratory actions because "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the longstanding policy limiting injunctions was designed to avoid.").

In order for a federal court to provide declaratory or injunctive relief where there is related, ongoing state court litigation, the case must fit within *both* an

exception to the Anti-Injunction Act[11] and an exception to the *Younger* doctrine. Section 1983 is an exception to the Act in that it constitutes an express authorization for injunctions, and thus Cook's claims clear this initial hurdle. *See Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972). However, the Court finds that no exception to *Younger* exists, and thus this Court is barred from offering the relief Cook seeks.

The *Younger* doctrine has evolved since its inception, and today, absent "extraordinary circumstances," abstention in favor of state judicial proceedings is required if the state proceedings (1) are ongoing; (2) implicate important state interests; (3) provide the plaintiff an adequate opportunity to litigate her federal claims; and (4) where the federal court's involvement would interfere in a way that *Younger* disapproves. *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1149 (9th Cir. 2007); *see also Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Even where the first three elements are satisfied, federal courts should not abstain absent a *reason* to abstain—"i.e., if the court's action would enjoin, or have the practical effect of enjoining, ongoing state court proceedings." *AmerisourceBergen*, 495 F.3d at 1149. Where these standards are met, a federal court "may not exercise jurisdiction," and there is no discretion to do otherwise. *San Jose Silicon Valley Chamber of Comm. Political Action Comm. v. City of San Jose*, 546 F.3d 1087, 1092 (9th Cir. 2008). In fact, "[w]here *Younger* abstention is appropriate, a district court cannot refuse to abstain, retain jurisdiction over the action, and render a decision on the merits after the state proceedings have ended. To the contrary, *Younger* abstention requires *dismissal* of the federal action." *Beltran v. State of Cal.*, 871 F.2d 777, 782 (9th Cir. 1988) (emphasis in original).

The Supreme Court has held that *Younger* abstention is appropriately applied to challenges to state custody and parentage proceedings. *See Moore v. Sims*, 442

---

[11] Dating back to 1793, the Anti-Injunction Act prevents federal courts from enjoining pending state court litigation unless the case satisfies a specific statutory exception. *See Mitchum v. Foster*, 407 U.S. 225, 231–236 (1972).

U.S. 415, 423(1979).[12]   In *Moore*, a husband, his wife, and their three minor children sought a declaration that parts of the Texas Family Code unconstitutionally infringed upon family integrity after a juvenile court judge entered an emergency *ex parte* order that gave temporary custody of the children to the State Department of Public Welfare.  *Id.* at 419–20.  The appellees moved to terminate that temporary custody order.  *Id.* at 420.  However, instead of moving to expedite the custody hearing in state court or request an earlier hearing before a state trial or appellate court, the family filed suit in federal court challenging the constitutionality of the relevant state statutes. *Id.* at 421.  After walking through the elements of *Younger* abstention, the Supreme Court held that the family's broad challenge to a state statutory scheme "militated in favor of abstention, not against it."  *Id.* at 427.

*Moore* is illustrative.  Just as there, Cook challenges the constitutionality of a family court order, and seeks to do so in federal court while her state court appellate case is pending.   Finding *Moore* persuasive, this Court is likewise "unwilling to conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation."  *Id.* at 435.

### 1.  Ongoing State Proceedings

In order to invoke *Younger* abstention, the County must demonstrate as a threshold matter that "state proceedings, judicial in nature, are pending."  *Middlesex*, 457 U.S. at 432.   Significantly, "the question is not whether the state judicial proceedings are still ongoing, but whether they were underway before initiation of the

---

[12] Cook argues that *Younger* abstention is inappropriate here because her state case is not criminal in nature, not a civil enforcement proceeding, and not a proceeding that involves orders that are "uniquely in furtherance of the state court's ability to perform judicial functions."  (Joint Opp'n 36, ECF No. 74 (quoting *NOPSI*, 491 U.S. at 368).)   Describing *Younger* solely in terms of those limitations ignores the current breadth of the doctrine, which counsels abstention where important state issues are at play.  As was made clear in *Moore*, abstention is appropriate in "civil proceedings in which important state interests are involved," including disputes over the constitutionality of state family law provisions.  442 U.S. at 423.

federal action." *Young v. Schwarzenegger*, No. C-10-03594-DMR, 2011 WL 175906, at *2 (N.D. Cal. Jan. 18, 2011) (citing *Gilbertson*, 381 F.3d at 969 n.4). Moreover, proceedings will be deemed ongoing until state appellate review is completed. *Gilbertson*, 381 F.3d at 969 n.4. This first prong is easily met here.

Cook filed the case at bar after C.M. filed his section 7962 in the Children's Court and before Judge Pellman's order. (ECF No. 1.) Accordingly, the Court finds that a state judicial proceeding was ongoing at the time of the federal filing. *See Beltran*, 871 F.2d at 782 (stating that abstention requires proceedings to be ongoing at the time plaintiff initiates federal proceedings). This state proceeding continues on today, as Cook appealed the February 9, 2016 judgment granting C.M.'s section 7962 petition on April 14, 2016. (Notice of Appeal, Plf.'s RJN, Ex. 14, ECF No. 84.) That appeal remains before the California Court of Appeal, and no longer appears to be stayed. (Supersedeas Denial, Kaiser RJN, Ex. A, ECF No. 62.) Until appellate review of the section 7962 judgment is complete, the Court must deem the matter "ongoing."

### 2.  Important State Interests

Myriad state interests are at play here, each of which satisfies the second step of the *Younger* analysis.

Cook is asking this Court to declare that a state court judgment is unconstitutional and to enjoin its enforcement. (SAC.) Setting aside the fact that Cook seeks federal court interference in family law matters, California still maintains an important interest in enforcing orders and judgments of its judicial system. *Gilbertson*, 381 F.3d at 973 (citing *Pennzoil*, 481 U.S. at 14 (holding that, so long as challenges to the process by which state judgments are obtained relate to pending state proceedings, "proper respect for the ability of state courts to resolve federal questions presented in state-court litigation mandates that the federal court stay its hand")). This reason alone satisfies *Younger*'s second step.

Of even greater state importance is the subject matter of this suit. The underlying state interest here is, perhaps, is one of a state's most precious. Cook is asking this Court to redefine parenthood under state law, and surely no area of law is of greater interest to the state than that devoted to the domestic realm. The power of a state to determine the custody of its youngest members is unique to the state, and accordingly federal courts should abstain from interference. *Moore*, 442 U.S. at 435 ("Family relations are a traditional area of state concern."); *Buechold v. Ortiz*, 401 F.2d 371, 372 (9th Cir. 1968) ("As Justice Holmes said . . . It has been understood that, 'the whole subject of domestic relations of husband and wife, parent and child, belongs to the laws of the states and not to the laws of the United States.'" (internal citations and quotation marks omitted)).

### 3. Opportunity to Present Federal Claims

The Family Court interpreted section 7962 to bar consideration of Cook's constitutional claims—or consideration of any facts that do not touch on the four corners of the surrogacy contract itself. (Section 7962 Order.) Looking just to the Family Court's actions, then, it would appear that Cook has no recourse to present her federal claims in the state judicial system. But such a conclusion is misguided; Cook has every ability to—and, indeed, already has—appeal Judge Pellman's refusal to entertain Cook's constitutional arguments during the section 7962 hearing.

Judicial review is inadequate only when state procedural law bars presentation of the federal claims. *See Moore*, 442 U.S. at 430 & n.12 (1979) (finding abstention appropriate because state law did not impose procedural barriers to raising constitutional claims). Cook, in turn, argues that neither Judge Pellman nor the California Superior Court were willing to entertain her constitutional claims, and thus the state court system is inadequate to hear her pleas. (Joint Opp'n 37.)

However, neither the fact that the Superior Court declined to accept Cook's initial filing nor Judge Pellman's refusal to assess her counterclaims in the section

7962 petition here mean that the state system is inadequate. *See Hirsh*, 67 F.3d at 713 (the fact that review is discretionary does not bar presentation of federal claims); *Beltran*, 871 F.2d at 781, 783 (opportunity to present federal claims in a writ petition is sufficient to trigger *Younger* abstention, even though the court of appeal simply "denied the petition without elaboration"); *Martori Bros. Distribs. v. James–Massengale*, 781 F.2d 1349, 1352, 1354 (9th Cir. 1986), *amended on other grounds*, 791 F.2d 799 (9th Cir. 1986) (opportunity to raise federal claims in petition for review satisfied the requirements of *Younger* even though a reviewing court could deny the petition summarily); *Fresh Int'l Corp. v. ALRB*, 805 F.2d 1353, 1362 (9th Cir. 1986) (finding abstention applicable because plaintiff "could have presented [its federal claim] to the court of appeal in its petition for review").

The nuances of family law do not counsel a different result. Again, *Moore v. Sims* is illustrative. In *Moore*, the Supreme Court explicitly reversed a district court order that declined to abstain where the litigation was "multifaceted," involved child custody determinations, and where the litigation was the "product of procedural confusion in the state courts." *Moore*, 442 U.S. at 422–43. This Court can think of no terms more apt to describe the case at bar than "multifaceted" and the "product of procedural confusion." *Id.* Cook's claims hinge on parentage determinations, contract interpretation, and constitutional law. She seeks both a declaratory judgment that she is the legal mother of three children to whom she has no biological tie, to enjoin the state from both recognizing a contract she willingly entered into, and to prevent the enforcement of a family court order. In the crosshairs sit three young infants and their biological and legal father. To say this case is "multifaceted" is an understatement.

*Younger* requires no more than the opportunity for the presentation of federal constitutional claims in the state proceeding; nothing presented to this Court implies that the California Court of Appeal is barred from entertaining Cook's constitutional claims. Moreover, this Court will not contradict decades of precedent and find that a

state court is incompetent to adjudicate federal constitutional claims.  *See id.* at 430–32; *Gilbertson*, 381 F.3d at 972.  Accordingly, the Court holds that the state judicial system affords Cook an adequate forum to seek relief.

### 4. Interference

Finally, even where all three *Younger* elements are met, the Ninth Circuit requires this Court to determine whether federal court involvement would interfere in a way that *Younger* disapproves.  *AmerisourceBergen*, 495 F.3d at 1149.  If this Court's continued participation in the litigation "would enjoin, or have the practical effect of enjoining, ongoing state court proceedings," abstention is required.  *Id.*

The policies supporting *Younger* abstention are present here.  If Cook prevailed, Judge Pellman's section 7962 Judgment would be enjoined, and the appellate process would be put on hold while this Court wades into California's family law scheme.  The Court therefore declines to even touch a toe into this state's domestic code.

### 5. Exceptional Circumstances

Although a federal court is normally required to abstain if the prongs of the *Younger* test are satisfied, abstention is inappropriate in certain "extraordinary circumstance[s]."  *See Gibson v. Berryhill*, 411 U.S. 564, 577–79 (1973) (abstention inappropriate where state tribunal is incompetent by reason of bias).  "Bias exists were a court has prejudged, or reasonably appears to have prejudged, an issue." *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992).  Establishing bias is no minor hurdle; "one who alleges bias 'must overcome a presumption of honesty and integrity in those serving as adjudicators.'" *Id.* at 333 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  Cook does not allege that the justices on the appellate panel have a personal or financial stake in this manner, and thus this Court finds no "exceptional circumstances" warranting federal jurisdiction.

Because Cook's claims would interfere with ongoing state court proceedings that implicate important state interests, and because Cook has an adequate opportunity to pursue her federal claims in those proceedings and has failed to overcome the presumption of honesty and integrity in those serving as adjudicators, the Court must abstain from adjudicating these claims pursuant to *Younger v. Harris* and dismiss the matter. *Beltran*, 871 F.2d at 782.

## VI.    CONCLUSION

For the above reasons, the Court **GRANTS** Defendants' Motions to Dismiss and directs the Clerk of Court to close this case.

**IT IS SO ORDERED.**

June 6, 2016

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**